Our next case for argument is FMC Corp. v. Sharda, 24-2335 at Topescu? How do I say your name? Topescu. Topescu. Please proceed. Good morning, Your Honors. May it please the Court, Your Honor, Topescu on behalf of Sharda USA, the appellant. The District Court erred in granting a preliminary injunction in this case for several reasons, but I want to focus on two in my argument, if I may. The first being that the District Court erred as a matter of law by construing the well-known term composition with new limitations based on what we think are flawed disclaimer theories. The second is that the Court overlooked substantial questions of anticipation under the proper construction. And so none of the disputes that FMC has raised take away from the vulnerability of the claims at this stage. We submit that under the proper claim construction, the Court should reverse the preliminary injunction given the substantial questions of invalidity with respect to anticipation of divergence. Well, I mean, at a minimum, we have to vacate if we agree with you on the claim construction, correct? Yes, ma'am. And so your claim construction argument is that they had a chance to say stable. They knew how to say stable. They said it in the provisional. They knew how to say stable. They said it in the 145 patent. They didn't say it here. I could have said it better myself. That's it, right? That is really, yes, the intentional removal of that material from the provisional. And that's the material they rely on for both stability and the exclusion, right, of the prior mixtures that they say are unstable. All of that was excised intentionally from the applications that led to the asserted patents. They knew how to keep it in the 145 like your Honor said. They didn't do it in the asserted patents. And we know that according to NPHJ and Finjen and DDR. Conscious choice. That is exactly right. Conscious choice. I'm anticipating the other side will say despite all of the deletions of physical stability, versions of the word stable, physical degradation from the specification of the asserted patents compared to the provisional and the 145, there's still content in the asserted patents that provide a strong clue that guide a skilled artisan to still think about these claimed compositions as being stable compositions. I know they focus on things like insecticidal activity. Maybe the word homogenous pops up somewhere. It sure does. Example one is still in the asserted patent specification, which if you take a peek at the provisional and the 145, it's clear that what is in example one is a stable composition. So could you speak to these different parts of the actual asserted patent specifications as to whether or not we should nevertheless still think about the claim compositions as being directed to stable compositions? Absolutely, Your Honor. And so let me start with homogenous. Your Honor mentioned homogenous. Homogenous pops up, I believe, twice or three times in the patent. And I take it that what they mean is that by talking about homogenous, they are in essence talking about stability. And therefore, that should be a reason to read stability into the claims. But one thing I will mention at the outset is that in the provisional, we also have a discussion of homogenous. Example one is homogenous. And then we have all the test data that presumably shows why it's stable. So there's a distinction even in the provisional between homogenous and stability. They are not one and the same. There's nothing here to suggest they're one and the same. Perhaps a homogenous solution is in the end stable. I don't know. The patent doesn't tell us that. But what we do know is that the discussion of stability and homogenous was in the provisional, and they've removed stability, left it homogenous. So I don't think homogenous rises to the level of a disclaimer of claim scope, especially as to stability. Now, they also talk, as Your Honor said, about insecticidal activity and the fact that there is a benefit to be had from what is claimed in the asserted patents. But let's be clear. All of the discussion of insecticidal activity, whether it's in the patents or in the prosecution history, is clearly tied to the claimed ratio. And that's what's claimed in the asserted patents. It's the claimed ratio. Right? And so, yes, there may be a benefit that is to be had from using these active ingredients at the claimed ratio, just like we see in the claims. And that may be increased activity. But that is not what the Court has done here. That is, the Court said it's stable, and it has excluded prior art mixtures that are unstable. Right? Right. I guess the question is, does activity equal stability? I don't believe so, Your Honor. Absolutely not. There's two – one thing we know. Let me start with this. One thing we know from the patents themselves is that when they talk about the benefit of increased activity, it is over the individual compounds. And I can't overstate this enough. In the provisional, they said we have two inventions, or two parts of an invention. One is that we have ratios that provide increased activity if you use the ingredients at the claimed ratio. Second, we have, for commercial purposes, a formulation which is stable if you use stabilizing ingredients.  And so in – and then they went on to distinguish in the provisional that the – as they do in the asserted patents, the prior art use of individual components when it comes to the increased activity. It was only with respect to stability where they said, oh, this is better than prior art mixtures of the active ingredients. And by the way, they didn't even disclaim the claimed ratios of the prior art in that case. But nonetheless, my point, Your Honor, is in the patents, the only discussion of increased activity and the benefit it's providing is with respect to the use of the individual compounds, not mixtures. That was with respect to stability in the provisional. That was dropped. So yes, even if there is something to be said about the benefit, which again, I don't think rises of increased activity. I don't think that rises to the level of a disclaimer that should be imported into the claims, especially when we have the claimed ratios already there. But even if there's something to be said about that, it is only vis-a-vis the use of the individual compounds. And that's not what the district court did. The district court excluded prior art mixtures of the – So even if we agree with you on this claim construction argument, I don't see how we get to the reversal that you've asked for. Well, Your Honor, because I think the record – on the record before this Court, and we appreciate the standard, right? The standard is whether district court would be compelled on this record to find that there is a substantial question of validity. Because we're not asking this Court to find anticipation. First of all, this is a preliminary injunction. The question is, did we raise a substantial question of invalidity below? And so, yes, this Court could remand on that issue and ask the district court to look at the issue again under the proper claim construction, or – But we don't have any fact findings on the references. So you want me to dive in and make fact findings on the references? We don't have any fact findings on the references. You're right. Your Honor, the Court looked at the McKenzie reference under its own claim – under the improper claim construction. But we think that the issues are simple, and we think McKenzie speaks so clearly as to the limitations of these claims, which simply require two ingredients in a claim ratio. And there's a table in McKenzie that says, here are the two ingredients – the two products, Capture and Mustang, which, by the way, their declarant has admitted, comprise the active ingredients. There's no dispute that Mustang and Capture are the active ingredients, regardless of which Capture you're looking at. I know there's an argument as to, well, this table doesn't say exactly which Capture. Is it 2EC? Is it the other Capture? It doesn't matter. Their declarant said Capture is bifenthrin. Mustang is zetacypermethrin. With that admission from them, that table couldn't be more clear. It discloses the claim range. I don't know what would compel the district court to find any other way. And so that's what we're asking this Court to do, is to look at that evidence and say – and we've provided in the appendix, we have citations to the claim charts that we provided that set forth where all the limitations are met. So the evidence is in the record. It is Appendix 460 to 468 and Appendix 469 to 492. So that evidence is in the record as to why these claims are anticipated. And I would submit to the Court that it is an easy exercise to see why the McKenzie reference anticipates. What about the mitocidal limitation? So on the mitocidal limitation, Your Honor – Was that argued below? I believe it was. Okay. I believe it was. And did the district court give it patentable weight? I think they referenced the mitocidal argument. The Court referenced the mitocidal argument in its opinion. I see. But I would say on the mitocidal, Your Honor, that, first of all, it is an intended use. It is an intended use, and it shouldn't be read into – it shouldn't have weight as to – or patentable weight as to the scope of these claims. And we know it's intended use for one of two – for several reasons, but at the very least, we have Claim 11. We have Claim 1 in the 416, and we have Claim 11. Claim 11 – we have one claim that says mitocidal. That's Claim 1. And we have Claim 11 that says mitocidal or insecticidal. And the limitations as to both of those claims are the same – identical. The same active ingredients, the same claim ratios. So we know by virtue of Claim 11 that insecticidal and mitocidal are interchangeable. It doesn't matter which one it is because the claims require the same ratio of the same active ingredients with respect to those two. So I don't believe, first of all, that mitocidal is limiting precisely because it is an intended use. We also know from FMC's own arguments – You're using your rebuttal time? Did you mean to do that? Feel free. It's your time. If I may, Your Honor. I'll finish this point, and then I'll sit. By FMC's own arguments, they have read mitocidal as to have a requirement of a certain application. Right? You know, application on the field of use. How much are you applying per acre? That's how they look at mitocidal. Well, there's nothing in the patent itself – there's actually no benchmarks for what constitutes a mitocidal composition in terms of that measure, which they've applied to McKenzie, to say this is how much you need for it to be mitocidal. Nothing in the patent tells you what that is. The only thing we know from the patent is mitocidal is a composition that has these ingredients and this claimed ratio. So without those benchmarks, if I have a liquid sitting in a bottle and I tell you it's got the active ingredients in the claimed ratio, how would you know if that infringed? Because according to FMC, it depends on how much you apply when you use it. And so for that reason alone, again, I don't think mitocidal has paddled away here and it should not be a hurdle as to McKenzie. Thank you, Your Honors. With that, I'll reserve the rest of my time for rebuttal. Mr. Walker? Thank you, Chief Judge Moore. I may please the Court. I'll get right into the claim construction issue here. I don't think there's much dispute that there is a disclaimer from the very first filing in this case, the 979 provisional. It says, tank mixtures, unstable compositions of bifenthrin and zeta-cypomethrin. Those are the prior art. That is the problem that we are now solving. Can you explain why the applicant here deleted all the many, many, many references to stability from the asserted patent specifications when compared to the provisional? We don't know why that happened. I mean, there's only one reasonable reading of why that happened. Obviously, with the 145, they kept all of the references and discussions about stability and the stability studies and et cetera, et cetera, and then got claims to that effect. Then they've got this other line of applications where they do a very assiduous, comprehensive job of deleting all of the passages and references to stability. So unless there is a second possible reason why they would do that that I'm not aware of, I can only think of one reason why they would do that, and that would be because they purposely decided to undo the narrowing of having all of those stability passages in the specification. Yeah, so the record doesn't show why that happened. Right, and I'm searching for what is the possible other reason for why a patent drafter would do that. Yeah, so the 145 patent is ultimately the one that issued first, so it seems they prioritized securing the claims that were governed in the or directed to the stability aspects of the invention that's disclosed in the provisional, and then they proceeded with the aspects that respect the effectiveness. But none of what they did in the applications that led to the patents here did anything to disavow or contradict the fact they had admitted that unstable compositions with these two active ingredients would be prior art, and therefore not something they invented and not something that they could purport to now be claiming as their invention. Why wouldn't it be something as simple as they tried to go for the grand slam here, and they said, okay, we got the claims that we actually invented something on, and now we want to go bigger, we want to go broader, we want the whole tamale. I think if there was some sort of grand plan to do that. Of course, unless there's another reason you can explain to me. Well, yeah, and I think if we're looking for a reason, what a skilled artisan might think was going on is they focused first on stability, because stability is so important to effectiveness, and then they saw the claims that were most directly affecting the effectiveness aspect of this invention. But they weren't hiding the ball on this. Remember, the very first thing that they cite in all these asserted patents, column one, first paragraph, is this claims priority to the 979 provisional. So a skilled artisan is going to read that entire intrinsic record. They read the entire intrinsic record. Well, your compliment is we have this case that came out not long ago called DDR, and DDR expressly on point says, I think, that when you have a provisional, and then you have a later application that deletes material from the provisional, that that can be disclaimed. Yeah, so in DDR, I don't think it was adopting any sort of rigid, mechanistic rule that any time something is deleted from a specification that that's the ballgame. I think it was saying that if you have a provisional that says, merchants are purveyors of goods and services, and then you have a later final application that chooses to narrow that, apparently not to avoid priority, but chooses to narrow it, the inference that a skilled artisan would draw is that they chose to narrow the scope of their invention. And here, I don't think that that inference works when the inference would be that they sought to broaden their invention to cover things that they have already admitted is prior art and cannot be something that they're claiming to invent. I think that inference just doesn't make sense. That's not how a skilled artisan would read these claims as claiming something you said is prior art, and so these claims are invalid ab initio. I think that inference just doesn't fit under the facts of this case, where supposedly they were broadening the claims to cover admitted prior art. Does the inclusion of the insecticide in other forms in the asserted patents get you anywhere? Yeah, so I think there is a lot that tethers the specification of the asserted patents to the stability that's more expressly disclosed in the provisional and the 145 patent. So it says in the beginning, describe all the different ways that this composition can be done, is a whole bunch of stable premixtures that are useful if they're diluted in water, which is what creates the biggest stability problems. It describes the invention in example one, which is the same example that's in the provisional and the 145 patent that we know is a stable composition. Describes it as being homogeneous, and homogeneous means it's not falling apart, it's not being unstable. And the unexpected effectiveness. Does it say that at the time of the mixture it's homogeneous, or does it say it remains homogeneous over a period of time? So there it's speaking about it's homogeneous at the time of the mixture, but we know that it's remaining homogeneous with time because we have these disclosures of the unexpected effectiveness. And I think my friend might have suggested... I'm sorry, are you talking about references to the 979 provisional? So the unexpected effectiveness is in the provisional, and it's also in the asserted patents themselves. They disclose here is the unexpected effectiveness compared to those off-the-shelf commercial products with those individual active ingredients. Is that getting back to the, I don't know, superior performance and insecticidal activity? Yes, yes. I think that's the superior unexpected synergistic insecticidal activity. So I guess I ask the same question that I ask your opposing counsel. Why should activity mean the same thing as stability? So the district court found, this is appendix 10, that skilled artisans would understand that there was this great connection between stability and effectiveness, in part because, as the provisional makes clear, it was well understood in the art that if you've got an unstable composition, it's going to lead to inadequate efficacy. That's 870, 871. I thought activity is really more about the level that you're able to kill these insects or the different types of insects that you can kill and things like that. It is, but as the district court recognized, that was known in the art, and this is disclosed in the provisional in 145 as well, it was known in the art that there is a very close tie between stability and effectiveness. If you have an unstable composition that's going to physically degrade, it's not going to be effective. It's going to be inadequately effective, as the provisional says, 871. And you don't have to take my word for it. This is something that Charda and its own expert said below. This is Appendix 2403. This is Paragraph 13 of their expert Hunt's declaration. He explains that if a composition is going to be significantly more effective than those prior art products like Mustang and Capture are individually, the composition would necessarily have to have been stable. Because if a phase separation were to occur that rendered the formulation unstable, you'd expect diminished levels of biological activity. And Charda adopted that at 2386 in the record. And so I think that just reinforces what the district court found, Appendix 10, based on the disclosures in the 979 provisional, that people of skill in the art would understand that there was a very intimate tie between effectiveness and stability. And now to be clear, we think that alone, by Charda's own reckoning, oh, and I will note, so Charda was saying that in connection with the McKenzie reference. That argument didn't work with respect to McKenzie because it was not actually more effective, as the district court found. But the principle is sound. You're not going to have a surprisingly effective composition if it's unstable in the line of art. And, well, I think that... Can you get to the anticipation question? If I can just make one last point on this? It's up to you. Yeah, I just say that I think that alone might get us a disclaimer based on Charda's own reckoning in the spec. But the point is, the things in the specs of these asserted patents tether it to the clear disclaimer that was made earlier. On anticipation, again, only necessary to reach that if you overturn the district court's claim construction. And on this one, we think, we understand the standard is you could affirm, despite a change in the claim construction, only if that's the only outcome possible on appeal. But we think with respect to anticipation and the mitocidal claims in particular, we think we can meet that standard. Now, the court disagrees. If it thinks it needs to go back down for further fact-finding, then it should vacate and remand. But on the mitocidal claims, we think, though, there's no disclosure in McKenzie of mitocidal activity. We think that that's a property. We don't think it's a use, necessarily. We think it's a property of the composition. Didn't it say that one of the components kills mites? Yeah, so the mustang and bifenthrin are miticides when used by themselves. But there's nothing in McKenzie that suggests that it's going to do that when you mix it with capture. I'm sorry, capture is the mitocidal one. There's nothing in McKenzie that suggests that when you mix it with mustang, which we know creates an unstable, fall-apart composition mixture, that it's going to have that same mitocidal property. And McKenzie wasn't trying, doesn't say anything about mites, wasn't trying to test mitocidal. Is there something in the record that, something evidence-based in the record that suggests that it wouldn't continue to be a mitocide? So I think what we know from the record is that control that is in the provisional, which I think also reinforces, the control is just a mix of capture and mustang, which makes pretty clear the inventors were not claiming to have invented just a mix of capture and mustang. But we know that that falls apart terribly. And so I think that's plenty of reason to think that it was not going to have that mitocidal property. Can I ask, I mean, I don't remember, and a lot of cases, a lot of records, but that's only in the preamble, isn't it? It is only in the preamble. And did you argue, or did the district court find, has anyone concluded that the preamble's limitation, because you know our precedent says that preambles are generally not limitations. There's actually a presumption that those are not, in fact, limitations. So I just don't remember, did I miss that in this record? So we argued here, of course, before the district court, district court didn't have to raise it, didn't have to reach that issue, because it found that the stability requirement wasn't met by McKenzie regardless. Oh, so you say I can only affirm if I reach an issue, claim construction, mind you, so question of law, because the district court didn't even reach. Yes, but it is a question of law, and so I think if the court thinks that it can make that decision, that it would be the best way to do here. Maybe especially because the finding of irreparable harm is uncontested on appeal, and so if the court feels that it's in a position to affirm, we'd ask that it do that. I'm recognizing that that's a big ask. But we did argue below that the mitocidal claims were separately patentable. Why shouldn't we potentially reverse if we agree there's a problem with the claim construction? Why wouldn't we go the other direction and conclude McKenzie clearly on its face discloses these two elements? Yeah, so I think it does not rise to the level of that's the only possible way the district court could come on this. What is the other way then? Tell me what the problem is with McKenzie's disclosure. Yeah, so it doesn't say anything about mites and doesn't give any indication that... No, that's going back to your preamble argument. Okay, so you want to go back... So I have to... Yeah, so... In order to not reverse, I have to reach the preamble argument? Is that what you're saying? Well, no. I think if the question is just whether you can vacate instead of reversing, any of the claims on anticipation would properly be vacated rather than reversed if those were the two choices. Well, yeah, I understand you prefer that, but why? And the reason is, in addition to the mitocidal claims, which we think would themselves sustain it, is that it's a factual question and there are definitely factual questions bearing in mind that this is more likely to prevail under a clear convincing standard at the end of the case. Whether McKenzie actually mixed these two things together... It talks about a continuous application of two or more tank mix partners, right? It does in a very general sense, but you'll note in the tables about the different kinds of experiments. For a lot of the other experiments, it actually has a footnote that says, we tank mix these two things together. There's no similar footnote that's in the tables. So you think these things can be in separate tanks? Or arguably someone could find they're in separate tanks? We think someone could find that these were being applied... And then mixed later, kind of thing. Or being sprayed from separate tanks, you know, separately like that. And if that would not involve the sort of composition, the tank mix composition that is supposedly invalidated. Now we're not asking the court to say the only possible way someone could come out on that particular question is in our favor, but we do think that if it were necessary to get there, because you disagreed with us on claim construction, because you disagreed with us on the mitocidal claims, that that should go down to the district court to resolve. And just on the mitocidal, I do want to point out that we did rely on that to distinguish the prior art during prosecution. 1104, we said we are limiting it to mitocidal claims. We struck the words insecticidal or in order to distinguish a prior art reference, Ballard, that disclosed soil-borne invertebrates and insects, but not mites, which are leaf-borne, not soil-borne. And so we did rely on that in 1104. And 1101 in the appendix is where that amendment is to distinguish a prior art. And we think under Catalina marketing, that's enough for the preamble to be limited. If there are further questions, we'd ask the court to affirm. OK. Thank you. If I may? Yes, please proceed. Real quickly on the issue of claim construction and the argument that we, through our declarants, somehow acknowledge that there's a link between stability and efficiency. That is inaccurate. And what I'd like to point the court to is the context for that statement, even in the provisional. If we look at appendix 871, this is in the summary invention in the provisional itself. There are two inventions that are defined. The first invention is that there's a mixture of pyrethroid and cyanopyrethroid, which exhibits an increase in insecticidal activity as compared again to the individual components. For commercial use, the composition comprising the mixture requires a novel formulation, which significantly improves stability when diluting the two insecticidal compounds in water. Specifically, and then it goes on to list, the ingredients that make it stable. And so, yes, if we're going to look at McKenzie, and say, is it stable? Then we would say, does it have, according to the court's claim construction, we would have to look at the claimed ratios that have the active ingredients in the claim ratios, and does it meet all these other properties? So our declarant was speaking to McKenzie meeting the court's construction, which requires stability. But if the court reverses on stability, we don't have to look at this question. And here, there's a clear distinction between the two inventions. And there is no link as to stability and efficacy. Efficacy, the activity, is solely tied to the claim ranges. And then it says, if you want to also make it stable, go ahead and put these stabilizing ingredients in. The acid, the solvent, the surfactant, et cetera. Et cetera. We see it at appendix 871, and we see it in the claims of the 145. And again, we have on the same day, FMC in the 145, carrying over the deleted material, and filing for claims that have the ingredients, the claim ratio, and the stabilizing ingredients, and calling that stable. So I don't think there's any question here as to the fact that there is no link between the two. What about their Catalina marketing argument about A1104 in their office action response, amending the claim to be a mitocidal compound? So on that point, Your Honor, I was going to speak back to that next. If you look at that actual file history, what they did is, the claim said insecticidal or mitocidal. And they struck out insecticidal. And they left it as mitocidal. And that's the argument they say, well, that shows you that we meant for this claim to be mitocidal, and that must mean something. Well, what I would tell the court is, if we look at the file history, what that tells us is that what they argued with respect to that claim, it wasn't that it's mitocidal, in that it has mitocidal properties distinguished over the prior. What they told the patent office is that because it's mitocidal, it requires a foliar application on the leaves of the plants. And the prior doesn't teach a foliar application. And that's why this claim, along with Claim 11, which on its face was a new claim that was added in the same amendment, it required a foliar insecticide or mitocide. So what they did is, they said, see, both of these claims, they're patentable because they're foliar. And the prior doesn't say foliar. It doesn't disclose foliar. So they never argued that mitocidal, that property, was what distinguished over the prior. It was the fact that it was foliar. And so that amendment, I don't think, means anything. Okay, thank you, counsel. We're out of time for today. I thank you, counsel. This case is taken under submission.